## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

DARWIN DEASON,

               Plaintiff,

– against –

XEROX CORPORATION

               Defendant.

No. __3:16-cv-2856_____

## COMPLAINT

      Plaintiff Darwin Deason, by undersigned counsel, for his Complaint against Defendant Xerox Corporation ("Xerox" or the "Company"), alleges on knowledge as to himself and upon information and belief as to all other matters as follows:

## NATURE OF THE ACTION

      1.      Mr. Deason seeks declaratory and injunctive relief to prevent Xerox from proceeding with its unlawful plan to reorganize the Company in a manner that violates Xerox's Restated Certificate of Incorporation (the "Certificate").  Xerox's improper scheme would deprive Mr. Deason of his right under the Certificate to own a preferred, convertible stake in both Xerox's high-growth Business Process Outsourcing ("BPO") business and its Document Technology and Document Outsourcing ("DTDO") business and significantly impairs the value of his unique investment.  Xerox granted Mr. Deason this right in the form of Xerox Series A Convertible Perpetual Preferred Stock (the "Series A Preferred") when Xerox acquired Affiliated Computer Services, Inc. ("ACS"), the company Mr. Deason founded, led, and controlled for more than 20 years and that now has become Xerox's successful BPO business.

2.      Xerox intends to conduct a multi-step transaction (the "Reorganization") by year-end 2016 that constitutes an effective unwinding of the Xerox/ACS merger.  In the initial stages of the Reorganization, Xerox intends to fundamentally reorganize its employees, businesses, debt, and assets in order to segregate the BPO business (*i.e.*, the business segment derived from the acquisition of ACS) into a separate subsidiary.  Next, Xerox intends to separate by dividend the newly-formed subsidiary housing the BPO business into a new publicly-traded company called Conduent Incorporated ("Conduent").

3.      In direct contravention of the terms of the Certificate, the Reorganization as currently proposed will trap Mr. Deason's Series A Preferred investment position in the post-Reorganization Xerox – a low-growth document technology business that will have a considerably diminished outlook and credit profile – without any stake in the valuable BPO business at Conduent.  But Mr. Deason's agreement with Xerox (which is of such significance that it is embodied in the Certificate) makes clear that he only agreed to sell the fruits of his life's work in exchange for a guaranteed, substantial stake in the combined company on terms that would preclude Xerox from marooning his investment in a company separated from the BPO business.  Xerox's attempt to abrogate the critical shareholder protections guaranteed in the Certificate is highly value-destructive for Mr. Deason and will cause Mr. Deason irreparable injury through the radical and permanent impairment of Mr. Deason's Series A Preferred position.

4.      Mr. Deason founded ACS in 1988 as a data services provider to the financial services industry.  Over the next two decades, Mr. Deason guided ACS to become a leading global provider of business process outsourcing and information technology services.  In 2010, Xerox acquired ACS for over $6 billion in cash and stock.

5.      As part of that acquisition, Mr. Deason, who controlled ACS through his holding of 43.6% of the outstanding voting power of ACS, bargained for and received the Series A Preferred with a face preferred amount of $300 million.  The Series A Preferred, held solely by Mr. Deason, is an extremely valuable and unique security that contains special terms that are specifically designed to appropriately compensate Mr. Deason for the sale of his controlling stake in ACS and to guarantee his continued investment in the combined investment-grade business of the Company.

6.      As a reflection of the significance of Mr. Deason's important rights, Xerox restated its Certificate of Incorporation in connection with the acquisition of ACS in 2010 to set forth the rights and powers of the Series A Preferred.  The Certificate provides that holders of the preferred (Mr. Deason is the only such holder) are entitled to receive quarterly dividends payable at an annual rate of 8%.  In addition, Article IV, Section 13(k) of the Certificate provides that if there is a "Reorganization Event" at Xerox, including a "reclassification, recapitalization or reorganization," then the Company *must* safeguard the holders' investment by providing the holders with the right to convert each share of the Series A Preferred into the type of securities granted to Xerox common stockholders in the reorganization transaction.

7.      The purpose of these provisions is to preserve the value of Mr. Deason's preferred investment in an investment-grade business and to ensure Mr. Deason's continued investment and participation in both the BPO and DTDO businesses of Xerox.  Accordingly, in the contemplated Reorganization, which will entitle Xerox common stockholders to receive Conduent common stock, Xerox must, under the Certificate, provide a mechanism that makes Mr. Deason's Series A Preferred convertible into Xerox and Conduent common stock in a value-preserving manner.  Only by Xerox's strict compliance with the terms of the Certificate will Mr. Deason's right – enshrined in the Certificate – to maintain the same kind and proportion of his

stake in the enterprise as a whole and the value of his interest be preserved.  Indeed, because Xerox and Conduent will be separate publicly-traded companies, Mr. Deason can only maintain his interest in the BPO business if he is granted conversion rights into Xerox and Conduent common stock.  The Reorganization provides for no mechanism to satisfy the obligations of Xerox in the future to provide Conduent common stock to Mr. Deason upon his exercise of his conversion rights.

8.     What is more, the Certificate makes clear that Xerox "shall not enter into any agreement for a transaction constituting a Reorganization Event unless . . . such agreement provides for, or does not interfere with or prevent . . . conversion of the Series A Preferred into the Exchange Property in a manner that is consistent with and gives effect to this Subdivision 13(k)."  "Exchange Property" is defined as "the kind of securities, cash and other property received in such Reorganization Event by the holders" of Xerox common stock.  Yet, in the pending transaction, Xerox intends to do exactly what its Certificate prohibits:  conduct a Reorganization Event while preventing or interfering with Mr. Deason's right to convert his preferred shares into the Exchange Property.

9.     On January 29, 2016, Xerox announced the Reorganization, which amounts to an unwinding of the ACS merger – a transaction that, at the time, was touted by Xerox's Chief Executive Officer as a "transformational deal."  As Xerox has stated publicly, the Reorganization will fundamentally reorganize its employees, businesses, debt, and assets in order to separate its BPO business from its DTDO business.  Indeed, as a result of the wide-ranging Reorganization, Xerox intends to shift to Conduent a business with more than 94,000 employees, $6.7 billion of revenues in 2015, and $9 billion in assets.

10.     Following Xerox's announcement of the Reorganization, and in light of the substantial risk to Mr. Deason's Series A Preferred investment resulting from the pending

separation of the BPO and DTDO businesses, Mr. Deason began nearly eight months of ultimately fruitless dialogue with Xerox in an effort to ensure that Xerox preserved the value of Mr. Deason's investment.  In connection with these efforts, Mr. Deason sought from Xerox sufficient information to evaluate the proposed Reorganization, including information regarding the post-Reorganization capital structures of both companies.  After stringing Mr. Deason along for months, Xerox refused to provide Mr. Deason with sufficient information or provide assurances that it will not over-lever the BPO business by saddling it with expenses, liabilities and excessive debt that should remain with Xerox.

11.    Worse, after months of communications in which Xerox led Mr. Deason to believe it would act in a manner that preserves the value of Mr. Deason's investment, Xerox has now made clear that it intends to deny Mr. Deason his conversion rights under the Certificate.  Indeed, according to Xerox, the contemplated Reorganization will strand the entirety of Mr. Deason's Series A Preferred at Xerox without any conversion rights into Conduent common stock.

12.    Remarkably, Xerox rejected an offer by Mr. Deason to forego litigation regarding the treatment of the Series A Preferred if Xerox obtained an unqualified legal opinion as to the validity of the Reorganization under the Certificate by a respected former judge of New York's Court of Appeals (Mr. Deason offered former Chief Judge Jonathan Lippman as an acceptable option to provide this opinion).  Xerox's out-of-hand rejection of this sensible suggestion reflects its lack of confidence that the Reorganization complies with its own Certificate.

13.    If Mr. Deason is deprived of the rights due under the Certificate, and left solely with a preferred stake in the post-Reorganization Xerox without conversion rights into both Xerox and Conduent common stock, the Reorganization will extinguish important rights

and massively destroy the value of Mr. Deason's unique investment.  Mr. Deason will lose the opportunity to participate in the growth of the BPO business that Mr. Deason was responsible for building.  Mr. Deason also will lose the protection of the creditworthiness of the combined businesses, exposing him to substantial financial risk, including with respect to the payment of his dividend, that he never intended nor agreed to assume.  And Xerox would be able to mandatorily convert his Series A Preferred into Xerox common stock at a lower price – shortening the duration and value of his dividend stream.  Indeed, Xerox's own financial advisors have estimated that the Reorganization will result in the loss of at least $11 million in value to Mr. Deason's Series A Preferred investment.  Even this one-sided analysis, however, significantly underestimates both the value of Mr. Deason's investment and the destruction of value that will be caused by the Reorganization, which may be as high as several hundred million dollars.  In this regard, Mr. Deason has received appraisals of his Series A Preferred of approximately $500 million.

14. Mr. Deason bargained for the value-preservation rights set forth in the Certificate, yet stands to lose them under Xerox's tortured reading of the document.  Strangely, and unfairly, holders of Xerox common stock will receive shares of Conduent common stock to preserve their investment in both businesses, yet Mr. Deason (from whose labor Xerox and its common stockholders have benefited) will not.  That is impermissible under the Certificate.

15. In sum, Xerox seeks to violate the Certificate by pulling the business Mr. Deason created out from under him and leaving him solely with an investment in an unattractive, low-growth document technology business.

16. The Company's breach of the plain terms of the Certificate should be enjoined and declared void as an *ultra vires* act.

**THE PARTIES**

17.     Plaintiff Darwin Deason founded ACS in 1988 in Dallas, Texas.  ACS was acquired by Xerox in 2010, and changed its name to Xerox Business Services, LLC in 2012.  Mr. Deason served as Chief Executive Officer and Chairman of the Board of Directors of ACS from 1988 to 1999 and continued to serve as Executive Chairman until the merger.

18.     Defendant Xerox is a New York corporation that maintains its headquarters in Norwalk, Connecticut.  Xerox's BPO segment provides business process outsourcing services, such as customer care, transaction processing, finance and accounting, human resources, communication and marketing, and consulting and analytics services, as well as services in the areas of healthcare, transportation, financial services, retail, and telecommunications.  It also provides document outsourcing services comprising managed print services, including workflow automation and centralized print services.  Xerox's DTDO segment offers printers, copiers, digital printing presses, and light production devices, and production printing and publishing systems for the graphic communications marketplace and large enterprises.  Xerox's DTDO segment also sells paper, wide-format systems, global imaging systems network integration solutions, and electronic presentation systems.  Xerox has 143,600 employees, and its total worldwide revenues in 2015 were approximately $18 billion.  Approximately 66% of Xerox's employees and 37% of its revenues are associated with its BPO business.

19.     If the Reorganization is consummated, Conduent will be a Fortune 500-scale business process services company with expertise in transaction-intensive processing, analytics and automation, with approximately $6.7 billion of revenues in 2015 and 94,000 employees worldwide.  It will have the second-largest market share in the business process outsourcing industry (behind only ADP and ahead of First Data).  If Xerox has its way, Mr.

Deason will be deprived of his bargained-for stake in the globally significant business that he built.

## JURISDICTION AND VENUE

20.     This is a civil controversy between citizens of different states.  Mr. Deason is a citizen and resident of Texas.  Xerox is a citizen of New York, the state in which it is incorporated, and a citizen of Connecticut, the state in which its corporate headquarters and principal place of business are located.  The amount in controversy, exclusive of interest, costs, and attorneys' fees, exceeds $75,000.  Accordingly, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

21.     This Court has personal jurisdiction over Xerox because Xerox has purposefully and willfully availed itself of the benefits and protections of the State of Texas. Xerox has significant contacts with Texas, including by employing thousands of people and maintaining offices in this District.

22.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the alleged events or omissions giving rise to the dispute occurred in this judicial district and because Defendant is subject to personal jurisdiction in this district.

## FACTUAL BACKGROUND

I.      **Mr. Deason Founds ACS**

23.     Mr. Deason founded Dallas-based ACS in 1988.

24.     Under Mr. Deason's leadership, ACS grew rapidly from a small, regional, privately-held company into the world's largest business process outsourcing firm, a publicly-traded Fortune 500 corporation with more than 74,000 employees across the globe, client operations in over 100 countries, and $6 billion in annual revenue.

25.     Prior to the merger, Mr. Deason controlled ACS through his ownership of 2,140,884 shares of ACS Class A Common Stock and 6,599,372 shares of ACS Class B Common Stock, constituting 43.6% of the voting power of ACS.

## II.     Xerox and ACS Merge

26.     In 2009, advisors for Xerox contacted Mr. Deason to discuss a potential merger of Xerox and ACS.   Following several months of negotiations, the merger was consummated on February 5, 2010, for $6.4 billion in cash and stock.

27.     Ursula Burns, the Chief Executive Officer of Xerox, made clear that Xerox viewed the merger as a "transformational deal" that fundamentally realigned Xerox into a global player in the provision of business process outsourcing services.  William M. Bulkeley & Joseph Pereira, *Xerox Takes Gamble in Bid for ACS*, WALL ST. J., Sept. 29, 2009.

28.     According to a Xerox press release announcing the merger, it "transform[ed] Xerox into the leading global enterprise for document and business process management."  Ms. Burns declared the transaction a "game-changer for Xerox" that "creat[ed] a new class of solution provider."   Xerox Press Release, *Xerox to Acquire Affiliated Computer Services* (Sept. 28, 2009).

29.     Ms. Burns further lauded the merger as a "game-changing initiative" that would triple Xerox's services revenue to $10 billion.   Christopher Hinton, *Xerox to Buy Affiliated Computer Services for $6.4 Billion*, MKT. WATCH, Sept. 28, 2009.  According to Ms. Burns, "[t]he way we were going was going to take 10 years . . . .  The path we were on wouldn't have given us scale fast enough."  Aaron Ricadela, *Xerox Bets Big on Services*, BLOOMBERG, Sept. 28, 2009.

**III.    The Certificate Grants Critical Protections to Mr. Deason as the Sole Holder of Series A Preferred**

30.    As part of the merger consideration, Mr. Deason bargained for and received Series A Preferred with a face preferred amount of $300 million, a newly created series of Xerox convertible preferred stock issued only to Mr. Deason, in exchange for Mr. Deason's sale of his control of ACS and his ACS Class B Shares. As described more fully below, the Series A Preferred is a unique security that was expressly designed and intended to allow Mr. Deason to preserve the value of his investment and to continue to participate in the growth of the BPO business.  Importantly, Mr. Deason did not in any way agree to allow Xerox to reorganize and separate its BPO business without receiving a continuing interest in that business.

31.    The rights and powers associated with the Series A Preferred are significant and required Xerox to restate its Certificate to add Article IV, Section 13, which sets forth the terms of the Series A Preferred.

32.    Under Sections 13(g) and 13(j), Mr. Deason's Series A Preferred has conversion rights into Xerox common stock at an initial conversion rate of 89.8876 shares of Xerox common stock per share of Series A Preferred, subject to certain adjustments as provided in the Certificate.

33.    Under Section 13(d), the Series A Preferred is entitled to the quarterly payment of cash dividends, as declared by the Xerox Board of Directors, on a cumulative basis at an annual rate of 8%, $24 million per year.

34.    Under Section 13(h), Xerox has the right to force a mandatory conversion of the Series A Preferred into Xerox common stock if the market price of the Xerox common stock exceeds certain thresholds over a 30-trading-day period.  Among other consequences, such

mandatory conversion would extinguish Mr. Deason's right to cumulative 8% dividends on the Series A Preferred.  The thresholds triggering these consequences have never been reached.

35.     The Certificate also provides the Series A Preferred with anti-dilution and participation rights and protections in certain situations, including upon "Fundamental Changes," "Liquidations," large distributions of the Company's common stock, and "Reorganization Events."  The purpose of these provisions is to preserve the value of Mr. Deason's investment.

36.     Section 13(k) provides important rights for Mr. Deason's Series A Preferred upon the occurrence of a Reorganization Event, including, in certain circumstances applicable here, rights in the future to convert Mr. Deason's investment into common stock of Xerox and the newly-formed company arising from the Reorganization.

37.     Among other things, Section 13(k)(i)(C) broadly defines "Reorganization Event" to include "***any reclassification, recapitalization or reorganization of the Corporation***."

38.     Upon the occurrence of a Reorganization Event, the Certificate provides that "each share of Series A Preferred Stock outstanding immediately prior to such Reorganization Event shall . . . become convertible . . . into the kind of securities, cash and other property received in such Reorganization Event by the holders of the Common Stock."  The Certificate defines such securities as the "Exchange Property."

39.     Thus, in the case of the Reorganization contemplated here, the Certificate expressly provides that Mr. Deason is entitled to a mechanism by which he may convert each share of the Series A Preferred into the same "Exchange Property" that Xerox common stock holders stand to receive once the Reorganization is consummated:  Conduent common stock (in addition to the existing conversion right available to Mr. Deason as the sole holder of Series A Preferred to convert into Xerox common stock).

40.     Section 13(k)(v) also includes a limit on the Company's powers by providing that "[t]he Corporation shall not enter into any agreement for a transaction constituting a Reorganization Event unless . . . such agreement provides for, or does not interfere with or prevent (as applicable), conversion of the Series A Preferred Stock into the Exchange Property in a manner that is consistent with and gives effect to this Subdivision 13(k)."   Thus, in a Reorganization Event, Xerox must provide for, and not interfere with, the conversion of Series A Preferred into Conduent common stock (in addition to the existing conversion right to convert into Xerox common stock).   The Reorganization provides for no mechanism to satisfy the obligations of Xerox in the future to provide Conduent common stock to Mr. Deason upon his exercise of his conversion rights.

41.     In sum, Section 13(k) protects Mr. Deason's right to convert his Series A Preferred into Xerox and Conduent common stock to preserve the proportional claim of the Series A Preferred on the total enterprise before and after the Reorganization Event and thus the value of his interest.

42.     The Company's powers to act are set forth, defined and restricted by the terms of the Certificate and the laws of New York.   It is axiomatic that Xerox is precluded from taking any action in violation of the provisions of the Certificate or the laws of New York.

43.     Accordingly, any contemplated Reorganization Event (and any implementing agreement) that does not provide Mr. Deason (as the sole holder of Series A Preferred) with the value-preserving rights to which he is entitled under the Certificate (*i.e.*, the right to convert each share of his Series A Preferred into Conduent common stock in addition to the right to convert each share into Xerox common stock) is null and void as an *ultra vires* act.

IV.      **Xerox Announces the Reorganization**

44.      Beginning in January 2016, Xerox made a series of announcements regarding the unwinding of its merger with ACS.  Xerox explained its plan to conduct a multi-step process that would begin with (i) numerous fundamental changes to Xerox's capital and organizational structures, including its reorganization and division of assets, debt, and employees, followed by (ii) a formal separation of the BPO business from Xerox into Conduent. Xerox stated in its Form 10-Q filed on August 4, 2016 its objective to complete the Reorganization by year-end 2016.  Xerox made clear that these steps were inextricably linked as part of a single transaction.  Indeed, Xerox has defined the "Reorganization" to include all of the steps, including those yet to be announced in its forthcoming Plan of Reorganization, a schedule to the Form of Separation and Distribution Agreement between Xerox and Conduent, filed with the SEC on October 11, 2016 with Conduent's Amendment No. 3 to its Form 10 Registration Statement (the "Separation and Distribution Agreement").

45.      Xerox has acknowledged that the proposed Reorganization begins with a fundamental reshaping of Xerox.   For example, in the Company's January 29, 2016 announcement of the Reorganization, Xerox declared that the transaction was part of a "strategic transformation program" that followed the completion of "an extensive structural review." Xerox Press Release, *Xerox to Separate into Two Market-Leading Public Companies Following Completion of Comprehensive Structural Review* (Jan. 29, 2016).

46.      On June 16, 2016, Xerox announced that the new BPO business would be named "Conduent" and the DTDO company would continue to be called "Xerox."  According to Xerox, the new company would immediately possess "the second-largest market share in the business process outsourcing industry" and would have 94,000 employees and $7 billion in annual revenues (as compared to 39,000 employees and $11 billion in annual revenues for the

legacy Xerox business).    Xerox Press Release, *Xerox Announces New Business Process Outsourcing Company Will Be Named "Conduent"; Document Technology Company Will Retain the Xerox Brand* (June 16, 2016).

47.    In a Form 10-Q filed with the Securities and Exchange Commission (the "SEC") on August 4, 2016, Xerox described the numerous fundamental changes that would result from the Reorganization, including:

(a)    "To effect the separation, Xerox will first undertake a series of internal transactions, following which Conduent Incorporated will hold, directly or through its subsidiaries, the BPO business."

(b)    "In conjunction with the separation, Xerox also began a three-year strategic transformation program targeting a cumulative $2.4 billion of savings across all segments. The program is inclusive of ongoing activities and $600 million of incremental transformation initiatives."

(c)    "During second quarter 2016, Restructuring and related costs of $71 million included restructuring and asset impairment charges of $63 million as well as $8 million of additional costs primarily related to professional support services associated with the implementation of the strategic transformation program."

(d)    "Second quarter 2016 net restructuring and asset impairment charges of $63 million included $73 million of severance costs related to headcount reductions of approximately 1,300 employees worldwide, $2 million of lease cancellation costs and $2 million of asset impairments.    These costs were partially offset by $9 million of net reversals for changes in estimated reserves from prior period initiatives as well as a $5 million gain from the sale of real estate impaired in prior periods."

(e)      "During the six months ended June 30, 2016, Restructuring and related costs of $197 million included restructuring and asset impairment charges of $186 million as well as $11 million of additional costs primarily related to professional support services associated with the implementation of the strategic transformation program."

(f)      "During the six months ended June 30, 2016, we recorded net restructuring and asset impairment charges of $186 million, which included $197 million of severance costs related to headcount reductions of approximately 6,100 employees worldwide, $4 million of lease cancellation costs and $2 million of asset impairments. These costs were partially offset by $12 million of net reversals for changes in estimated reserves from prior period initiatives as well as a $5 million gain from the sale of real estate impaired in prior periods."

48.      Xerox has repeatedly stated that the final step of the Reorganization—the formal separation of Conduent from Xerox—is inextricably linked to the substantial changes being made to Xerox in the initial steps of the process.   For example, the Preliminary Information Statement filed with the SEC on August 15, 2016 with Conduent's Amendment No. 1 to its Form 10 Registration Statement states that "[i]n connection with the Spin-Off, Xerox will undertake . . . internal reorganizations of, and transactions among, our wholly-owned subsidiaries and operating activities."   *See* Aug. 15, 2016 Preliminary Information Statement at 75.

49.      What is more, the Separation and Distribution Agreement refers to the transaction as a "Reorganization" no fewer than *18 times*.   As but one example, the Separation and Distribution Agreement defines "Reorganization" as the multi-step process culminating with the separation of Conduent:

"Reorganization" means the transfer of the Conduent Assets that are not already owned by members of the Conduent Group to members of the Conduent Group and the assumption of the Conduent Liabilities that are not already owed by members of the Conduent Group by members of the Conduent Group, and the transfer of Xerox Assets that are not already owned by members of the Xerox Group to members of the Xerox Group and the assumption by members of the Xerox Liabilities that are not already owed by members of the Xerox Group by the Xerox Group, all as more fully described in this Agreement, the Ancillary Agreements and the Real Estate Separation Documents and including the steps set forth in the Plan of Reorganization.

The forthcoming "Plan of Reorganization" – Xerox's title – governing the Reorganization will likely have thousands of steps.  Xerox's counsel, moreover, has confirmed to Mr. Deason that Xerox expects that the Separation and Distribution Agreement will constitute a "plan of reorganization" for purposes of Section 368 of the Internal Revenue Code.

50.     On October 3, 2016, Xerox announced that, following the Reorganization, Conduent would trade on the New York Stock Exchange under the symbol CNDT and Xerox would continue to trade as XRX.  According to Ashok Vermuri, the designated future Chief Executive Officer of Conduent, "[o]ur separation into Xerox and Conduent will create two independent, Fortune 500-scale, publicly traded companies with distinct and compelling investment propositions and differentiated financial profiles, growth drivers and business prospects."  Xerox Press Release, *Conduent to Trade on New York Stock Exchange Following Separation from Xerox* (Oct. 3, 2016).

**V.     Xerox Violates the Certificate by Refusing to Recognize the Reorganization as a "Reorganization Event"**

51.     Even though Xerox has repeatedly referred to its undertaking as a "Reorganization," Xerox has refused to acknowledge that the Reorganization is a "Reorganization Event" in correspondence with Mr. Deason.  Rather, Xerox has cynically taken the position that the Reorganization will constitute a "small" distribution under Article IV,

Section 13(j)(v) of the Certificate and thus require no issuance to Mr. Deason of conversion rights into Conduent common stock.

52.     But it is clear that the broad scope of the multi-step Reorganization brings it within the definition of "Reorganization Event" in Article IV, Section 13(k), rather than a "small" distribution event as described in Article IV, Section 13(j)(v) of the Certificate.   The Reorganization, including the planned separation of the BPO business, amounts to a fundamental transformation of Xerox.   There is nothing "small" about it.   Xerox's refusal to accept this fact defies the plain language of the Certificate and common sense.

53.     Indeed, while the term "reorganization" is not defined in the Certificate, Black's Law Dictionary defines "reorganization" as a "[g]eneral term describing corporate amalgamations or readjustments occurring, for example, when one corporation acquires another in a merger or acquisition, a *single corporation divides into two or more entities*, or a corporation makes a substantial change in its capital structure."   The multi-step Reorganization that will result in two standalone Fortune 500-scale companies unquestionably fits this definition.

54.     Thus, Xerox's bad faith refusal to provide Mr. Deason with Conduent conversion rights is in direct contravention of the Certificate.   Xerox has refused to comply with Section 13(k) and provide Mr. Deason with the right to convert his preferred stock "into the kind of securities, cash and other property received in such Reorganization Event by the holders of the Common Stock" – that is, Conduent common stock.   The Reorganization provides for no mechanism to satisfy the obligations of Xerox in the future to provide Conduent common stock to Mr. Deason upon his exercise of his conversion rights.   Xerox has taken this position despite publicly acknowledging that holders of Xerox common stock will receive common shares of Conduent as Exchange Property in the Reorganization.   Granting Mr. Deason these rights is

necessary to "give effect to" Section 13(k) by allowing Mr. Deason to maintain his current investment position.

55.     In refusing to recognize the Reorganization as a "Reorganization Event," and in refusing to provide Mr. Deason with rights due in such an event, Xerox is threatening to violate its own Certificate and to commit an *ultra vires* act.

## VI.    Xerox Rebuffs Plaintiff's Efforts to Obtain Information and to Bring the Reorganization into Compliance with the Certificate

56.     Following Xerox's announcement of the Reorganization in January 2016, Mr. Deason has tried to work with Xerox to preserve the value of his investment, but has been stymied at every turn.  Despite Mr. Deason's status as the founder of the BPO business, former controlling shareholder of ACS, a significant shareholder of Xerox, and the only Series A Preferred holder, Xerox repeatedly rebuffed Mr. Deason's attempts to reform the Reorganization appropriately and repeatedly refused to provide Mr. Deason with the information necessary to evaluate the implications of its proposals for his Series A Preferred.

57.     On April 20, 2016, a representative of Mr. Deason and Mr. Deason's counsel, Cadwalader, Wickersham & Taft LLP, met with Xerox's counsel, Cravath, Swaine & Moore LLP, and its financial advisors, including Lazard Freres & Co. and Goldman Sachs & Co., to discuss the required treatment of the Reorganization under the Certificate.

58.     At that meeting, Xerox's representatives stated that Xerox intended to treat the Reorganization as a "small" distribution under the Certificate, and not as a "Reorganization Event."  As part of a purported "small" distribution, Xerox intended for the Series A Preferred to remain solely at Xerox, without any rights for conversion into Conduent common stock.  Mr. Deason's advisors, in turn, made clear that Xerox's position was untenable

under the Certificate, which requires the fundamental transformation of the Company contemplated by the Reorganization be treated as a Reorganization Event.

59.     The parties' representatives agreed to work together in an effort to resolve the disagreement.  Mr. Deason's representatives identified the information required from Xerox to understand the risks Mr. Deason was assuming from Xerox's proposal, including the proposed capital structure and allocation of assets and liabilities between the two companies.   In the negotiations that followed, Mr. Deason's goal has always been to bring the Reorganization into compliance with the Certificate and to reach an agreement that would appropriately preserve Mr. Deason's investment.

60.     On June 6, 2016, at Xerox's request, Mr. Deason's counsel provided Xerox's counsel with a term sheet for a proposal involving two new series of convertible preferred stock to be issued in exchange for the existing Series A Preferred in connection with the Reorganization, substantially as discussed with Xerox's advisors on April 20, 2016:  (i) new Xerox convertible preferred stock; and (ii) Conduent convertible preferred stock.

61.     Effective June 30, 2016, the parties executed a confidentiality agreement in which the parties agreed that Xerox would provide Mr. Deason with confidential non-public information regarding the Reorganization.[1]  Despite Mr. Deason's entry into the confidentiality agreement, however, Xerox persisted in its refusal to commit to bring its plans into compliance with the Certificate or provide Mr. Deason with adequate information to evaluate whether Xerox's proposals would preserve the value of the Series A Preferred, despite numerous requests for information made by Mr. Deason's representative.  Xerox eventually provided Mr. Deason

---

[1] Under the terms of the confidentiality agreement, the parties expressly agreed that the agreement did not impose any restrictions on the disclosure or use of information by the parties in litigation filings to enforce their rights with respect to the Series A Preferred.

with a few high-level slides containing limited information regarding the Reorganization. These slides, which included only limited and incomplete information relating to revenue, cash flow, and indebtedness of the post-Reorganization companies, were insufficient for Mr. Deason to make a fully informed analysis.

62. In August and September 2016, the parties exchanged term sheets regarding the potential allocation of Mr. Deason's preferred stock between the post-Reorganization companies. Xerox, however, continued to withhold the information necessary for Mr. Deason fully to evaluate whether the value of his interest would be protected under Xerox's proposal.

63. On September 20, 2016, Mr. Deason's representative wrote to Xerox's financial advisors, following numerous requests by telephone, and emphasized that the limited nature of the information relating to the Reorganization Mr. Deason had received to date – including, in particular, incomplete information regarding the post-Reorganization capital structures of Xerox and Conduent, and the post-Reorganization allocation of preferred stock – prevented him from adequately understanding the transaction and confirming that Xerox's proposal would protect the value of his investment. Mr. Deason's representative provided a detailed list of unanswered questions, including information relating to the post-Reorganization capital structures of the two companies and the allocation of debt.

64. On September 21, 2016, Xerox purported to respond to the letter, but still did not provide certain information that was requested. Rather, Xerox rehashed the same limited, high-level data and forecasts regarding the Reorganization that it had previously provided. In its letter, Xerox also purported to impose an arbitrary deadline of September 26, 2016 for Mr. Deason to agree to Xerox's demands. As a result, Mr. Deason still could not

adequately evaluate the impact of Xerox's plans on his investment.  Nevertheless, Mr. Deason continued to engage with Xerox in a good faith effort to resolve the dispute.

65.     On September 29, 2016, Mr. Deason's representative met with Xerox's financial advisors to discuss certain information that Mr. Deason had requested to understand the impact of Xerox's plans on Mr. Deason.  However, Xerox still did not fully respond to Mr. Deason's requests to provide sufficient information relating to the post-Reorganization capital structures of the two companies and the allocation of debt and expenses and information relating to dividend and buyback strategies.

66.     On October 1, 2016, Mr. Deason wrote to Xerox's Independent Directors and offered to agree to the Reorganization and Xerox's proposed allocation of the Series A Preferred between Xerox and Conduent if he were provided with adequate visibility into the post-Reorganization capital structure and expenses of the two companies.  Without that information, it would not be possible for Mr. Deason to evaluate whether the proposed allocation would preserve the value of the Series A Preferred.  In the same letter, Mr. Deason advised Xerox's Independent Directors that the current plan of classifying the Reorganization as a "small" distribution, not a "Reorganization Event," violated Mr. Deason's rights under the Certificate and was also *ultra vires*.

67.     In this letter, Mr. Deason also expressed his concerns with the Board's recent history of engaging in value-destructive stock buybacks as part of an apparent scheme to manipulate Xerox's EPS figures.  In the spirit of constructive engagement, and in a proposal reflective of Mr. Deason's substantial stake in the Company, Mr. Deason informed the Independent Directors that he intended to propose candidates to the boards of directors for both Xerox and Conduent and requested the Board's cooperation to appoint one such nominee to each Board.

68.     On October 3, 2016, Xerox responded to Mr. Deason in a document that provided no additional information but purported to impose an arbitrary one-day deadline for Mr. Deason to agree to the Reorganization.   Absent Mr. Deason's immediate agreement, Xerox threatened to violate the terms of the Certificate by "leav[ing] 100% of the preferred at Xerox post-separation" without any provision for conversion rights to Conduent common stock, thus depriving Mr. Deason of his entitlement under the Certificate to receive such conversion rights post-Reorganization.   According to Xerox, "there is no legal requirement to allocate the preferred."  A significant result of Xerox's threatened treatment of the Series A Preferred would be to impose adjustments to its conversion price, increasing the risk that Xerox could force a mandatory conversion of the Series A Preferred under Section 13(h) and extinguish Mr. Deason's 8% preferred dividend rights.

69.     Despite Xerox's ultimatum, Mr. Deason continued his attempts to reach a consensual resolution.  Mr. Deason offered to forego litigation regarding the treatment of the Series A Preferred if Xerox obtained an unqualified legal opinion regarding the validity of the Reorganization under the Certificate by a respected former judge of New York's Court of Appeals.  Mr. Deason's counsel specifically recommended that Xerox consider reaching out to Jonathan Lippman, former Chief Judge.  Tellingly, Xerox rejected the offer out-of-hand.

70.     On October 11, 2016, Xerox filed its Amendment No. 3 to its Form 10, which does not disclose any provision or mechanism for Mr. Deason to receive conversion rights for both Xerox and Conduent common stock.  Among other notable omissions, the Form 10 makes no allowance for such conversion rights in the summary of the Reorganization or the capitalization table.  By its silence on what would be a material aspect of the Conduent capital structure, the Form 10 thus makes clear that Xerox is denying Mr. Deason his rights under the Certificate.

71.     In light of Xerox's intransigence, Mr. Deason has concluded that further attempts at dialogue would not be productive.  Rather, it is likely that Xerox will exploit any further attempts at engagement by Mr. Deason to attempt to ram through the Reorganization structured in a way that ends Mr. Deason's preferred investment in the business he devoted his career to building, as well as his rights to dividends on the Series A Preferred, in clear breach of the terms of the Certificate.  The Reorganization provides for no mechanism to satisfy the obligations of Xerox in the future to provide Conduent common stock to Mr. Deason upon his exercise of his conversion rights.

## MR. DEASON WILL SUFFER IRREPARABLE INJURY FROM XEROX'S *ULTRA VIRES* CONDUCT

72.     Allowing the Reorganization to proceed unabated constitutes *per se* irreparable injury to Mr. Deason because the Company's unlawful plan violates the unambiguous terms of the Certificate and is thus void and without valid effect as an *ultra vires* act.

73.     Moreover, in the absence of an injunction, Mr. Deason will suffer irreparable harm because he will be deprived of the unique and noncompensable position he now owns that includes a convertible preferred interest in the BPO business with an 8% dividend rate that is convertible into common shares at a fixed conversion ratio.

74.     If the Reorganization proceeds as planned by Xerox, Mr. Deason will suffer massive, irreparable value destruction.  Mr. Deason will lose his right to participate in the upside of the fast-growing services business at Conduent.  Mr. Deason will face a heightened risk of default with respect to his dividend rights in a substantially downsized Xerox.  Mr. Deason also will unquestionably lose value, as even Xerox's own financial advisors recognize that the value of Series A Preferred in a stand-alone Xerox is worth significantly less than in the combined company.  Mr. Deason never would have agreed to such risk when he accepted the

Series A Preferred in exchange for his control premium in ACS.  Indeed, the Certificate does not allow for it.

75.    Mr. Deason is the only holder of the Series A Preferred.  The loss of this equity optionality cannot readily be valued or adequately compensated with money damages.  If Xerox proceeds with the Reorganization and Mr. Deason is reduced to holding a preferred interest only in the DTDO business convertible into common stock of the DTDO business, money damages will be inadequate to compensate Mr. Deason for his convertible preferred interest in the combined DTDO and BPO enterprise with an 8% dividend and conversion rights at a fixed ratio.

76.    Mr. Deason spent his life's work building ACS, and he specifically bargained for the rights protecting the Series A Preferred so that he could own a convertible preferred interest that covers the BPO Segment.  The Reorganization threatens irreversibly to strip Mr. Deason of this interest guaranteed to him in Xerox's Certificate upon the occurrence of a Reorganization Event.

### CLAIM FOR RELIEF
**(For Declaratory and Injunctive Relief Against Xerox for *Ultra Vires* Acts)**

77.    Mr. Deason repeats and realleges the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

78.    An actual and justiciable controversy exists between Mr. Deason and Xerox.

79.    Xerox is on the verge of effectuating the Reorganization, which Xerox itself characterizes as a "reorganization," yet Xerox is denying Mr. Deason the conversion rights to which he is entitled under the terms of the Certificate upon the occurrence of a Reorganization Event.

80.     Indeed, Xerox has declared that it will leave the entirety of Mr. Deason's Series A Preferred in Xerox post-Reorganization without conversion rights into Conduent common stock.

81.     The Certificate broadly defines a "Reorganization Event" as, among other things, "any reclassification, recapitalization, or reorganization" of the Company."

82.     The contemplated Reorganization is unquestionably a "Reorganization Event" under the Certificate.  The multi-step transaction, which includes radical changes to the Company's capital structure and business plan, involves the shifting of 66% of Xerox's employees and 37% of its revenues to a newly-formed subsidiary that will then separate into Conduent.  What is more, Xerox and Conduent have repeatedly described the Reorganization as a "reorganization" in their public filings, including Conduent's Preliminary Information Statement and the Separation and Distribution Agreement.  Xerox's counsel has also confirmed that Xerox expects that the Separation and Distribution Agreement will constitute a "plan of reorganization" for purposes of Section 368 of the Internal Revenue Code.

83.     Upon the occurrence of a "Reorganization Event," the Certificate requires Xerox to provide Mr. Deason, as the sole holder of Series A Preferred, with certain conversion rights.

84.     Article IV, Section 13(k)(i) of the Certificate requires Xerox to provide Mr. Deason with conversion rights into Conduent common stock.  Specifically, Section 13(k)(i) provides that "each share of Series A Preferred . . . shall . . . become convertible . . . into the kind of securities, cash and other property received in such Reorganization Event by the holders of the Common Stock."  Because Xerox Common Stock holders will be entitled to receive shares of Conduent common stock in connection with the Reorganization, Xerox must put into place a

mechanism to make the Series A Preferred convertible into both Xerox and Conduent common stock in a value-preserving manner.

85.     What is more, Section 13(k)(v)(A) provides that Xerox "shall not enter into any agreement for a transaction constituting a Reorganization event unless . . . such agreement provides for, or does not interfere with or prevent (as applicable), conversion of the Series A Preferred Stock into the Exchange Property in a manner that is consistent with and gives effect to this Subdivision 13(k)."

86.     In violation of the limit on its powers in Section 13(k)(v)(A), Xerox purported to implement the Reorganization by its execution of the Separation and Distribution Agreement, a contract that does not provide Mr. Deason with the requisite conversion rights under the Certificate.

87.     Thus, the Reorganization is in violation of the Certificate, *ultra vires*, and null and void.

88.     Mr. Deason will suffer irreparable injury if, through the *ultra vires* acts of Xerox, he is not granted the conversion rights due under the Certificate.

89.     Because Mr. Deason will suffer irreparable injury if the Reorganization is completed in abrogation of his rights under the Certificate, Mr. Deason respectfully requests that the Court issue an order preliminarily enjoining the Reorganization.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Mr. Deason respectfully requests that the Court enter judgment against Xerox as follows:

(a)     Declaring that the Reorganization constitutes a "Reorganization Event" under the Certificate;

(b)     Declaring that Xerox's unlawful scheme to deprive Mr. Deason of his right upon the occurrence of a Reorganization Event to receive conversion rights to Conduent common stock in a value-preserving manner (in addition to Mr. Deason's existing conversion right to convert into Xerox common stock) violates the terms of the Certificate and is *ultra vires*;

(c)     Enjoining Xerox from consummating the Reorganization;

(d)     Awarding Mr. Deason the full costs of this action, including reasonable attorneys' fees; and

(e)     Granting Mr. Deason such other and further relief as this Court may deem just and proper.

Dated:  Dallas, Texas
      October 11, 2016

JACKSON WALKER LLP

By:   /s/ David T. Moran
      David T. Moran
      Texas Bar No. 14419400
      dmoran@jw.com
      2323 Ross Avenue
      Suite 600
      Dallas, Texas 75201
      Telephone:  (214) 953-6051
      Facsimile:  (214) 661-6677

Of Counsel:

CADWALADER, WICKERSHAM & TAFT LLP

Richard M. Brand (*pro hac vice* application forthcoming)
Nathan M. Bull (*pro hac vice* application forthcoming)
Adam K. Magid (*pro hac vice* application forthcoming)
200 Liberty Street
New York, NY  10281
Telephone:  (212) 504-6000

Facsimile:  (212) 406-6666
Email:  richard.brand@cwt.com
Email:  nathan.bull@cwt.com


QUINN EMANUEL URQUHART & SULLIVAN, LLP
John B. Quinn (*pro hac vice* application forthcoming)
Harry A. Olivar, Jr. (*pro hac vice* application forthcoming)
Ryan Landes (*pro hac vice* application forthcoming)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA  90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100
Email:  johnquinn@quinnemanuel.com

Daniel P. Cunningham (*pro hac vice* application forthcoming)
51 Madison Avenue, 22nd Floor
New York, NY  10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100